United States District Court
Southern District of Texas
**ENTERED**

February 21, 2020

David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| KENNETH WAYNE HAWKINS, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. H-18-3052 |
| | § | |
| U.S. DEPARTMENT OF HOUSING | § | |
| AND URBAN DEVELOPMENT, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND RECOMMENDATION**

Pending before the court[1] is Defendant U.S. Department of Housing and Urban Development's ("HUD") Motion to Dismiss for Lack of Subject Matter Jurisdiction and Failure to State a Claim (Doc. 30) and the response filed thereto.  For the reasons discussed below, it is **RECOMMENDED** that the motion be **GRANTED**.

## I. Case Background

Plaintiffs are residents of Coppertree Village Apartments, LLC ("Coppertree Village"), a housing complex subsidized by HUD under the Project Based Rental Assistance (PBRA) program.[2]  Coppertree Village is owned by Coppertree Village Holdings LLC; Coppertree Village Holdings, LLC, contracted with HUD to accept rental subsidies pursuant to a Housing Assistance Payment ("HAP")

---

[1]  This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost Reduction and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72.  See Doc. 11.

[2]  See Doc. 22, Pls.' Am. Compl. p. 5.

contract.[3]  Under the PBRA, each plaintiff pays thirty percent of household income as his or her share of the rent; HUD pays the balance.[4]  In this suit, Plaintiffs complain that Coppertree Village provides housing that is unsafe, unsanitary, and violative of HUD housing quality standards.[5]  Plaintiffs seek to compel HUD to provide them with portable housing vouchers and other moving assistance so they can leave Coppertree Village.[6]

## A.  **Consolidated Appropriations Act**

The 2018 Consolidated Appropriations Act (the "Act"), passed on March 23, 2018, provided appropriations for HUD and numerous other federal agencies for the remainder of fiscal year 2018. Generally, the Act allocated funds to specific programs within an agency.  Relevant to the present action, Section 222(a) of the Act conditioned the receipt of certain housing assistance payments on the recipient's maintaining decent, safe and sanitary premises, "as determined by the Secretary of [HUD]," and required that the recipient comply with all state and local regulations relating to the physical condition of any property under a HAP contract.  See 2018 Consol. Approp. Act, PL 115-141, 132 Stat. 348, § 222(a).

Section 222(c)(1) required HUD to provide the owner of a non-

---

[3]     See id.

[4]     See id.

[5]     See id.

[6]     See id. p. 49.

complying property with a notice of default within fifteen days of an inspection "with a specified timetable, determined by the Secretary, for correcting all deficiencies." <u>See</u> 2018 Consol. Approp. Act, PL 115-141, 132 Stat. 348, § 222(c)(1).  At the expiration of the timetable, HUD was authorized to take any of the following nine actions:

(A) require immediate replacement of project management with a management agent approved by the Secretary;

(B) impose civil money penalties, [to] be used solely for the purpose of supporting safe and sanitary conditions at applicable properties, as designated by the Secretary, with priority given to the tenants of the property affected by the penalty;

(C) abate the section 8 contract, including partial abatement, as determined by the Secretary, until all deficiencies [were] corrected;

(D) pursue transfer of the project to any owner, approved by the Secretary under established procedures, which [would] be obligated to promptly make all required repairs and to accept renewal of the assistance contract as long as such renewal [was] offered;

(E) transfer the existing section 8 contract to another project or projects and owner or owners;

(F) pursue exclusionary sanctions, including suspensions or debarments from Federal programs;

(G) seek judicial appointment of a receiver to manage the property and cure all project deficiencies or seek a judicial order of specific performance requiring the owner to cure all project deficiencies;

(H) work with the owner, lender, or other related party to stabilize the property in an attempt to preserve the property through compliance, transfer of ownership, or an infusion of capital provided by a third-party that [would require] time to effectuate; or

      (I) take any other regulatory or contractual remedies
      available as deemed necessary and appropriate by the
      Secretary.

See 2018 Consol. Approp. Act, PL 115-141, 132 Stat. 348, § 222 (c)(2).

Section 222(d) of the Act counseled that the goal of HUD was to maintain its project-based contracts "subject to the exercise of contractual abatement remedies to assist relocation of tenants for major threats to health and safety after written notice to the affected tenants." However, the section also provided that, if HUD determined that the property was not suitable for continued rental assistance payments under the PBRA or other programs based on the cost of rehabilitating the property and other environmental conditions that could not be remediated, HUD could "contract for project based rental assistance payments with an owner or owners of other existing housing properties, or provide other rental assistance." See 2018 Consol. Approp. Act, PL 115-141, 132 Stat. 348, § 222(d)(1),(2).

**B.**   **The HAP Contract**

In 2015, HUD approved the reassignment of an existing HAP Contract to Coppertree Village Holdings. Pursuant to the HAP Contract, Coppertree Village was required to maintain and operate the contract premises in compliance with the standards set forth in the contract.[7] If HUD, or a third-party administrator acting for

---

[7]     See id. p. 6.

HUD, determined that the applicable housing standards were not met, HUD had the option to withhold assistance payments from Coppertree Village and to use that amount of withheld funds to relocate affected residents.[8]

In September-October 2016, Southwest Housing Compliance Corporation ("Southwest"), acting on behalf of HUD, conducted a review of Coppertree Village and issued a report on October 28, 2016.[9]  Coppertree Village received an overall unsatisfactory rating in the categories of security and general appearance, and the review required Coppertree Village to take corrective action within thirty days.[10]

The unsatisfactory finding in the area of security was based on the number times the Houston Police Department was called to the complex in the prior twelve months, the non-use of a gatehouse at the entrance to the complex, inadequate lighting and inoperable security cameras.[11]  The limited use of off-duty police personnel as additional security was found to be insufficient to deter criminal activity on the property.[12]

The review also required unit inspections, corrective

---

[8]     See id. pp. 6-7.

[9]     See id. p. 8.

[10]    See id.

[11]    See id.

[12]    See id.

5

maintenance, and updated written procedures to address implementation and oversight of work-order completion.[13]

## C.  __2018 Inspection__

In late June 2018, Southwest inspected Coppertree Village in the categories of physical conditions, general appearance and security and issued a second unsatisfactory rating on July 26, 2018, in the security and general appearance categories.[14]  The bases for the unsatisfactory rating for security were broken fencing, a permanently open vehicular access gate, an unused guard shack, the lack of security cameras and an excessive number of police calls to the property.[15]

The inspection also found that no annual unit inspection had been performed since March 2017, and no repairs had been made to any unit covered by the HAP contract.[16]  There was no available documentation that lead-based paint abatement had been undertaken or that tenants had been advised of the possibility that their units had lead-based paints.[17]  Unrepaired fire damage made eleven units unavailable for renting.[18]  And, there were over two hundred

---

[13]   See id.

[14]   See id. pp. 9, 10.

[15]   See id. p. 10.

[16]   See id.

[17]   See id. p. 11.

[18]   See id.

open work orders.[19]   The report concluded that the owner of
Coppertree Village had not corrected deficiencies noted in the 2016
inspection and questioned whether the owner was capable of
providing acceptable management of the property.[20]

Following the Southwest inspection, HUD conducted its own
inspection on September 28, 2018.[21]  HUD inspected only a sample of
the HAP units at Coppertree Village and found 117 health and safety
deficiencies.[22]  Projecting this number to all units, HUD estimated
that there might be 875 deficiencies if all units were inspected.[23]
Other deficiencies noted were non-working refrigerators in a high
percentage of units, damaged walls, floors, tubs and sinks, missing
steps and missing or damaged locks on doors.[24]

Based on this inspection, HUD sent a Notice of Default to the
owner of Coppertree Village on October 3, 2018, based on the June
2018 Southwest inspection.[25]  A second Notice of Default was sent
to the owner of Coppertree Village on October 9, 2018, based on the
September 2018 HUD inspection.[26]  On October 18, 2018, HUD notified

---

[19]     See id.

[20]     See id. p. 12.

[21]     See id.

[22]     See id.

[23]     See id.

[24]     See id. p. 13.

[25]     See id.  pp. 13-14.

[26]     See id. p. 14.

the tenants that the property received unsatisfactory ratings after its recent inspections and explained that HUD had given the owner sixty days to correct the deficiencies.[27]  Plaintiffs allege that the Notices of Default are final agency decisions.[28]

## D.  **Procedural History**

Plaintiffs filed the present suit on August 31, 2018, against HUD, Coppertree Village and Coppertree Village Holdings, LLC, alleging that they violated their legal obligations to provide decent, safe and sanitary housing under the Fair Housing Act ("FHA").[29]

In their amended complaint filed January 4, 2019, Plaintiffs allege that many of the deficiencies noted in the October 2018 Notices of Default were still present after the sixty-day remediation period.[30]  Plaintiffs also complain that electric service to the complex was erratic, water leaked into units after heavy rains, mold was present in many of the units and some heaters were not working.[31]  As in the original complaint, Plaintiffs seek judicial review of HUD's decision not to terminate the PBRA contract with Coppertree Village, and seek an order compelling HUD

---

[27]    See id. p. 15.

[28]    See id. p. 16.

[29]    See Doc. 1, Pl.'s Compl. pp. 20-22.

[30]    See Doc. 22, Pl.'s Am. Compl. p. 18.

[31]    See id.  p. 19.

to issue them housing vouchers that would enable them to move from Coppertree Village.[32]

On March 1, 2019, HUD filed the pending motion to dismiss, arguing that the court lacks subject matter jurisdiction because there is no final agency decision and because contract enforcement is committed to agency discretion by law.  Alternatively, HUD complains that Plaintiffs have failed to state a claim of intentional discrimination violative of the Equal Protection component of the Fifth Amendment.

On August 2, 2019, Plaintiffs filed a stipulation of dismissal against Coppertree Village and Coppertree Village Holdings, LLC.[33]

## II.  Dismissal Standards

### A.  Rule 12(b)(1)

Pursuant to the federal rules, dismissal of an action is appropriate whenever the court lacks jurisdiction. Fed. R. Civ. P. ("Rule") 12(b)(1), 12(h)(3).  The party asserting jurisdiction bears the burden of proof.  Ramming v. United States, 281 F.3d 158, 161 (5th Cir. 2001).  The court may decide the motion on any of three bases: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts."  Id.  The court, in determining

---

[32]    See id.

[33]    See Doc. 52, Stip. of Dismissal.

whether it is properly vested with subject matter jurisdiction, is "free to weigh the evidence and resolve factual disputes in order to satisfy itself that it has the power to hear the case." Krim v. pcOrder.com, Inc., 402 F.3d 489, 494 (5th Cir. 2005)(quoting Montez v. Dep't of Navy, 392 F.3d 147, 149 (5th Cir. 2004)).

The court should decide the Rule 12(b)(1) motion before addressing any attack on the merits. Ramming, 281 F.3d at 161. A dismissal of a complaint pursuant to Rule 12(b)(1) "is not a determination of the merits and does not prevent the plaintiff from pursuing a claim in a court that does have proper jurisdiction." Id.

"A case is properly dismissed for lack of subject matter jurisdiction when the court lacks statutory or constitutional power to adjudicate the case." Home Builders Ass'n of Miss., Inc. v. City of Madison, 143 F.3d 1006, 1010 (5th Cir. 1998)(internal quotations omitted).

## B.  Rule 12(b)(6)

Pursuant to Rule 12(b)(6), dismissal of an action is appropriate whenever the pleading, on its face, fails to state a claim upon which relief can be granted.  It need not contain "detailed factual allegations" but must include sufficient facts to indicate the plausibility of the claims asserted, raising the "right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007); see also Ashcroft v. Iqbal, 556

10

U.S. 662, 677-78 (2009). Plausibility means that the factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. 678.

### III.   Analysis

The United States cannot be sued in the absence of an express waiver of sovereign immunity. See United States v. Nordic Village, Inc., 503 U.S. 30, 33 (1992); Alabama-Coushatta Tribe of Tex. v. United States, 757 F.3d 484, 488 (5th Cir. 2014). The Administrative Procedure Act ("APA") grants district courts jurisdiction over two types of actions involving claims against the government based on unlawful agency actions. See 5 U.S.C. §§ 702, 704.

### A.   **APA Review Standards**

Section 702 of the APA allows a district court to hear an action against the United States "seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority." 5 U.S.C. § 702. Section 702 permits judicial review if the agency's conduct is "otherwise subject to judicial review." See Alabama-Coushatta Tribe of Tex., 757 F.3d at 488. Under Section 702, a plaintiff must identify an agency action that triggers the entitlement to judicial review. Id. at 489 (citing Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 882

11

(1990)).

Section 704 allows a district court to review a final agency decision "made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. See also Bennett v. Spear, 520 U.S. 154, 175 (1997)(same). In the absence of a final agency decision, the court lacks subject matter jurisdiction under the APA.   See Veldhoen v. U.S. Coast Guard, 35 F.3d 222, 225 (5th Cir. 1994)(holding that the APA permits "non-statutory" judicial review only of a "final agency action").[34] A final agency action must "mark the consummation of the agency's decisionmaking process" and "be one by which rights or obligations have been determined, or from which legal consequences will flow." Sierra Club v. Peterson, 228 F.3d 559, 565 (5th Cir. 2000)(internal citations and quotation marks omitted).  A nonfinal agency order is "one that does not itself adversely affect [the] complainant but only affects his rights adversely on the contingency of future administrative action." Am. Airlines v. Herman, 176 F.3d 283 (5th Cir. 1999)(quoting F.T.C. v. Standard Oil Co. of Cal., 449 U.S. 232, 245 (1980)).

The standards to be applied on review of a final agency decision are governed by 5 U.S.C. § 706.  Section 706 allows the court "to . . . decide all relevant questions of law, interpret

---

[34]    Neither party has cited the court to any provision of the FHA that provides for judicial review of HUD decisions, therefore the general review provisions of the APA apply by default.  See Sierra Club v. Peterson, 228 F.3d 559, 565 (5th Cir. 2000).

constitutional and statutory provisions and determine the meaning or applicability of the terms of an agency action." Section 706(1) allows a court to compel agency action unlawfully withheld or unreasonably delayed. 5 U.S.C. § 706(1). Plaintiffs do not seek review under Section 706(1) of the APA, but seek review under the broader terms of Section 706(2).[35]

Section 706(2) allows a court to set aside an agency action, findings and conclusions found to be: (1) arbitrary, capricious, an abuse of discretion, or not in accordance with law; (2) contrary to a constitutional right, power, privilege or immunity; (3) in excess of statutory jurisdiction; (4) without observance of procedure required by law; (5) unsupported by substantial evidence; or (6) unwarranted by the facts if the facts are subject to a de novo trial by the reviewing court. 5 U.S.C. § 706(2).

However, before any review of a final agency decision may be had, a party must first clear the hurdle of Section 701(a). See Heckler v. Chaney, 470 U.S. 821, 828, (1985)(hereinafter "Chaney"). Section 701(a) permits judicial review of a final agency decision unless the applicable statute precluded judicial review or the agency action was committed to agency discretion by law.[36] Id.

---

[35] See Doc. 34, Pls.' Resp. p. 17.

[36] 5 U.S.C. § 701(a) states:

This chapter applies, according to the provisions thereof, except to the extent that -

(1) statutes preclude judicial review; or

**B.   Action Committed to Agency Discretion**

In Chaney, the Supreme Court considered whether the Food and Drug Administration's ("FDA") refusal to take enforcement action to prohibit the use of certain drugs in executions by lethal injections was reviewable under the APA or excluded from review by Section 701(a)(2). Chaney, 470 U.S. at 823. The petitioners, prisoners on death row, argued that the drugs were not approved for use in lethal injections and constituted misbranding under the Federal Food, Drug and Cosmetic Act ("FDCA"). Id. at 823-24. The FDA Commissioner refused to take the requested action, and the district court affirmed, finding that decisions of the executive branch to refrain from instituting investigative and enforcement proceedings were unreviewable by the courts. Id. at 825. Rejecting the government's argument the decision not to take action was committed to agency discretion by law, a divided court of appeals reversed and found that because of the strong presumption that all agency action was subject to judicial review and in light of the FDA's policy to investigate the unapproved use of an approved drug when it endangered public health, judicial review of the FDA's refusal to act was appropriate. Id. at 826.

The Supreme Court determined that Section 701(a)(2)'s nonreviewability provision must be construed to apply where the

---

(2) agency action is committed to agency
discretion by law.

14

applicable statute "is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." Id. at 830.  In such a case where the statute provides no guidance, the statute can be read to have "'committed' the decisionmaking to the agency's judgment absolutely." Id.  In so holding, the Supreme Court drew support from earlier case law that recognized that an agency's decision not to prosecute or enforce is a decision generally committed to an agency's "absolute" discretion.  Id. at 831 (collecting cases).

The Supreme Court explained that the reasons for APA-nonreviewability are many and cited an agency's need to balance a number of factors which were peculiarly within the agency's expertise, including whether agency resources were best spent on the alleged violation, whether the agency was likely to succeed if it acted and whether the enforcement action best reflected the agency's overall policies.  Id.  The Court also noted that when an agency refused to act, "it generally does not exercise its coercive power over an individual's liberty or property rights, and thus does not infringe upon areas that courts often are called upon to protect." Id. at 832.  Finding that the FDCA contained no indicia of the factors to be considered when the FDA was considering the institution of an enforcement action, the Supreme Court found that the FDCA committed complete discretion to the FDA when deciding to take no enforcement action.  Id. at 835.

Courts have determined that many of HUD's final agency decisions are committed to agency discretion by law.  See Westchester v. U.S. Dep't of Hous.& Urban Dev., 778 F.3d 412 (2nd Cir. 2015)(finding that the rejection of a grant application was not reviewable); Inclusive Cmtys. Project, Inc. v. U.S. Dep't of Hous. & Urban Dev.; No. 3:07cv945, 2009 WL 3122610, at *7 (N.D. Tex. Sept. 29, 2009)(unpublished)(finding that the setting of market rent for Section 8 housing was not reviewable); Am. Disabled for Attendant Programs Today ("ADAPT") v. U.S. Dep't of Hous. & Urban Dev., 170 F.3d 381, 387 (3rd Cir. 1999)(finding that the failure to carry out enforcement duties under FHA was not reviewable); Hill v. Group Three Hous. Dev. Corp., 799 F.2d 385, 396 (8th Cir 1986)(holding that HUD's failure to take enforcement action against a Section 8 landlord was not reviewable under Sec. 701(a)(2) of the APA).

Although Plaintiffs repeatedly complain that they were "denied" housing vouchers and that HUD abused its discretion by withholding portable housing vouchers from them, these characterizations are self-serving and incorrect.  Plaintiffs never directly applied for housing vouchers; their potential receipt of housing vouchers was dependent on HUD's enforcement decisions at Coppertree Village.

As outlined in Plaintiffs' Amended Complaint, Coppertree Village failed two inspections and was cited for violating numerous

16

housing standards and FHA regulations.  The property was given a time period within which to correct the deficiencies. Under the 2018 Consolidated Appropriations Act, if a subsidized property did not correct the deficiencies within that time period, HUD had a number of enforcement options to consider.[37]  See 2018 Consol. Approp. Act, PL 115-141, 132 Stat. 348, § 222(c)(2)(A)-(I).  HUD could have required the immediate replacement of the property's management, imposed civil monetary penalties, abated the PBRA contract, transferred the property to another owner, and/or barred the owner from participating in other federal programs.  See id. The Act also authorized HUD to "work with the owner, lender, or other related party to stabilize the property in an attempt to preserve the property through compliance . . . ."  Id.  If, after considering all alternatives HUD determined that the property could not be remediated, the Act authorized HUD to terminate the HAP contract and to issue housing vouchers to the residents.  See id. at § 222(d)(1),(2).

In Mackenzie v. Castro, No. 3:15cv752, 2017 WL 1021299, at *1 (N.D. Tex. Mar. 16, 2017), the court found that Mackenzie had failed to identify a final agency action that could trigger APA review.  There, a company complained that the City of Dallas (the "City") had thwarted its efforts to develop an office building into

---

[37]Section 222(c)(2) states, "At the end of the time period for correcting all deficiencies specified in the Notice of Default, if the owner fails to fully correct such deficiencies, the Secretary may . . . ."

an affordable housing project.  Id. at *1.  Mackenzie, a private
citizen, participated in the filing of a complaint with HUD that
alleged that the City's actions violated the Fair Housing Act.  Id.
The company eventually withdrew its complaint; the City entered
into a voluntary compliance agreement with HUD; and HUD closed its
investigative file.  Id.  Mackenzie filed suit, alleging that HUD
and others violated his constitutional right of due process,
numerous non-discretionary provisions of the FHA and other federal
statutes by closing the file.  Id.

The court dismissed Mackenzie's complaint, finding that HUD
did not finally determine any party's legal rights and nothing
precluded Mackenzie from filing suit against the City directly if
it was violating the FHA.  Id. at *5.  In so finding, the court
explicitly found that the voluntary compliance agreement with HUD
and the closure of HUD's file were not final agency decisions
because HUD had not determined the rights of the complaining party
and no legal consequences flowed from HUD's action.  Id. at *6.

As in Mackenzie, no legal consequences flowed from HUD's
decision to take a less draconian enforcement action with respect
to Coppertree Village.[38]  Instead, HUD opted to secure compliance
with HUD's regulations through additional inspections and other

---

[38]    The court acknowledges that the effect of HUD's decision was that
Coppertree Village residents would not be moved to other subsidized housing or
offered housing vouchers.  But, because Plaintiffs have no legal entitlement to
the issuance of  portable housing vouchers, the court finds that the decision had
no legal consequences.

administrative enforcement actions.  The Act's permissive language, "if the owner fails to fully correct such deficiencies, the Secretary may . . .," conferred on HUD the discretion to decide what options to pursue and when to pursue them.  One of the options contained in the Act was that HUD could continue to work with the owner to obtain compliance.

The Amended Complaint makes it clear that Plaintiffs' preference was that HUD determine that Coppertree Village could not be remediated and issue housing vouchers to its residents.  But the decision to pursue compliance with the regulations with the existing management was committed to HUD's discretion by law and is not reviewable under Section 701(a)(2).

In so finding, the court expressly rejects Plaintiffs' attempt to recharacterize HUD's tacit rejection of certain available enforcement options as final agency actions that may be reviewed under the APA's Sections 702 and 704.  If Coppertree Village's condition ultimately cannot be brought into compliance with applicable housing regulations, terminating its HAP contract and relocating its residents are still actions that may be taken by HUD.  But simply because HUD has not opted to implement the extreme measure of closing Coppertree Village when Plaintiffs deemed it appropriate, does not transform a potential action or a "wait and see" posture into a final agency action because no rights have been affected by HUD's keeping its options open.  See Sierra Club v.

Peterson, 228 F.3d at 565 (stating that a final agency action is one from which legal consequences flow).   The court concludes that HUD's decision not to terminate the HAP contract with Coppertree Village based on the October 2018 notices of default is not reviewable under the APA's Section 701(a)(2).

## C.  <u>Allegations of Intentional Discrimination</u>

In their Amended Complaint, Plaintiffs also claim that HUD's withholding of housing vouchers was racially discriminatory, violating 42 U.S.C. §§ 3604(a), 3608(e)(5) and the Equal Protection component of the Fifth Amendment.[39]   Plaintiffs generally allege that HUD has institutionalized racial segregation by funding Coppertree Village beginning in 1981 in violation of its site selection regulations and has renewed the HAP contract with the property since that time.[40]   They posit that, while HUD pays for PBRA housing in both White non-Hispanic low income areas and predominantly minority areas, the HUD-subsidized housing in the White non-Hispanic areas is "decent, safe, and sanitary," while the housing in predominantly minority areas is not.[41]   Based on this alleged disparity, Plaintiffs argue that HUD has a history of "intentional support for racial segregation" that is "longstanding in duration and pervades HUD's administration of the PBRA program

---

[39]   <u>See</u> Doc. 22, Pls.' Am. Compl. pp. 22-25, 44-45.

[40]   <u>See</u> <u>id.</u>  pp. 43-44.

[41]   <u>See</u> <u>id.</u> pp. 40-41.

20

in the City of Houston."[42]  Plaintiffs conclude that these unequal housing conditions are evidence that HUD's decision not to issue housing vouchers was based on their race.[43]

### 1.  **Sections 3604(a) and 3608(e)(5) of the FHA**

Section 3604(a) generally makes it unlawful for a property owner to "refuse to sell or rent after the making of a bona fide offer [ ] or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." Plaintiffs allege that HUD violated Section 3604(a) when it failed to issue housing vouchers to Plaintiffs, thereby making a dwelling "unavailable" to Plaintiffs.

Section 3608(e)(5) charges the Secretary of HUD "to administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies" of the FHA.  Again, Plaintiffs allege that the failure to issue housing vouchers violated HUD's duty to affirmatively further the policies undergirding the FHA and does not require them to identify a final agency decision to obtain review of these alleged statutory violations.

HUD replies that neither Section 3604(a) nor Section 3608(e)(5) imposes a requirement that it issue housing vouchers or any other

---

[42]    See id. p. 42.

[43]    See id. pp. 47-49.

specific act to further its housing policies.  Plaintiffs concede this point but argue that Section 702 of the APA permits an overarching review of HUD's actions and inactions which they characterize as amounting to intentional discrimination based on race.

Allegations that HUD generally violated Sections 3604(a) and 3608(e)(5) must be pursued through Section 702 of the APA because neither section of the FHA creates a private right of action against the federal government.  <u>See</u> <u>Inclusive Cmtys. Project, Inc. v. U.S. Dep't of Treasury</u>, (hereinafter "<u>ICP, Inc.</u>") Civil Action No. 3:14cv3013, 2016 WL 6397643, at *4 (N.D. Tex. Oct. 28, 2016)(unpublished)(citing cases)(holding there was no private right of action against HUD for failing to further policies of the FHA under § 3608(d))(citing cases).

As discussed earlier, where the review sought is not pursuant to a specific statutory authorization, but only under the general review provisions of the APA, the agency action must be a deemed a final agency action under Section 704.  <u>See</u> <u>Lujan</u>, 497 U.S. at 882.

In the present case, the only final agency actions referenced in the amended complaint are the notices of default, actions for which Plaintiffs do not seek review.  The action for which Plaintiffs seek review, the decision to take no further enforcement action against Coppertree Village, is not a final agency decision because no legal consequences were triggered by that decision.  <u>See</u>

Peterson, 228 F.3d at 565.

There is no Fifth Circuit case addressing whether Section 3608(e)(5) or Section 3604(a) provides the court with jurisdiction to review claims of intentional discrimination by HUD in the absence of a final agency action. The court considers cases from other circuit courts discussed by the parties.

In N.A.A.C.P. v. Secretary of Housing and Urban Development, 817 F.2d 149, 151 (1st Cir. 1987), the plaintiffs brought suit under Section 3608(e)(5) of the FHA alleging that HUD had failed to remedy a lack of desegrated housing in the Boston area by tacitly allowing the local housing authority to continue to support the segregated housing status quo. The district court dismissed the action, finding that HUD's actions were committed to agency discretion under the APA and thus were not reviewable under Section 701(a)(2). Rejecting the notion that Section 3608(e)(5) conferred a private right of action against the government, the First Circuit reversed, finding that there was a presumption of judicial review for those persons "adversely affected or aggrieved by agency action" under the APA's Section 702 and that Section 706 permitted the court to set aside an agency action that was not in accordance with law or was unlawfully withheld. Id. at 152.

The court acknowledged that in Chaney the Supreme Court held that an agency's decision not to investigate a *particular* alleged violation was unreviewable, but that on remand the relevant inquiry

should be whether HUD's *pattern* of activity revealed a failure to live up to its statutory obligations under Section 3608(e)(5).  Id. at 158.  The actions to be reviewed by the district court were those various acts and omissions related to HUD's administration of certain grants in order "to determine whether, taken together, they violate[d] the obligation to further the goals of Title VIII [of the FHA]."  N.A.A.C.P., 817 F.2d at 159.

In ADAPT v. U.S. Department of Housing, 170 F.3d at 382, the district court was asked to consider whether HUD had a history of failing to investigate complaints of violations of Section 504 of the Rehabilitation Act by its housing providers.[44]  The district court found that, although 24 C.F.R. § 8.56(b) imposed a nondiscretionary duty to investigate when HUD received information concerning a possible violation of the regulations,[45] the regulations as a whole did not set forth significant standards to permit judicial review.  The district court concluded that HUD's lackluster enforcement actions were not reviewable under Section 701(a)(2) of the APA.

The Third Circuit agreed, relying on Chaney's admonition that, before courts may review decisions not to enforce certain regulations, Congress must first provide standards to limit an

---

[44]   See 29 U.S.C. § 794.

[45]   24 C.F.R. § 8.56(b) stated, "The responsible civil rights official shall make a prompt investigation whenever a compliance review, report, complaint or any other information indicates a possible failure to comply with this part."

agency's discretion.   See id. at 386.   In so holding, the Third Circuit rejected a claim that Section 3608(e)(5) provided an independent source of law to apply to the court's consideration of whether HUD abused its discretion in failing to aggressively pursue actions against landlords who violated the Rehabilitation Act.   Id. at 387.

In Darst-Webbe Tenant Ass'n Board v. St. Louis Housing Authority, [hereinafter "Darst-Webbe"] 339 F.3d 702 (8th Cir. 2003), the Eighth Circuit held that, under Section 3608(e)(5), HUD had a duty to affirmatively further fair housing policies when awarding a HOPE VI grant to the City of St. Louis and remanded to the district court for additional review of whether HUD complied with its statutory duties by considering the potential effects of the grant on available housing in minority communities.   Id. at 713. The court also remanded disparate impact claims brought under Section 3604(a) for more detailed fact-finding.

In making these rulings, the Eighth Circuit assumed without discussion that it could consider whether HUD was acting in violation of Section 3604(a), Section 3608(e)(5) and other statutes designed to prevent discrimination in public housing pursuant to Section 706(2) of the APA and did not address whether Sections 3604(a) or 3608(e)(5) provided adequate standards for judicial review.   Id. at 709.

Here, as in ADAPT, the issue before the court is whether HUD

has permitted unlawful discrimination by failing to adequately enforce applicable housing standards at Coppertree Village. A review of HUD's decision not to issue housing vouchers in light of the admonitions in Sections 3604(a) or 3608(e)(5) would require the court to review a discrete decision not to take an enforcement action against Coppertree Village, a decision committed to agency discretion by law. The court finds the reasoning in ADAPT to be persuasive because it, too, was tasked with considering whether it could review discretionary enforcement actions taken or not taken by HUD.

The court declines to follow Darst-Webbe because there, the court did not consider whether Sections 3604(a) and 3608(e)(5) provided adequate guidance for judicial review under Chaney but merely assumed that judicial review was available under the APA. The court also rejects the reasoning in N.A.A.C.P. because while the First Circuit discussed Chaney and considered whether the actions to be reviewed were subject to Section 701(a)(2) of the APA, it concluded that the availability of an APA review would be implied because fair housing was an important right and the district court could "find adequate standards against which to judge the lawfulness of HUD's conduct." The court finds this reasoning troublesome. In Chaney, the Supreme Court clearly held that Congress must set the standards by which the agency must act and for which the court would review. See Chaney, 470 U.S. at 835-838. The First Circuit in

26

N.A.A.C.P. imposed on the lower court a task that the Supreme Court refused to consider, that is, a mandate to set up its own statutory standards and conduct a review based on those standards.  And, unlike in the present case, in N.A.A.C.P., the court had discrete final decisions to review.

For this court to undertake a Section 706(2) review of HUD's decisionmaking as demanded by Plaintiffs would require the court to decide what Section 3608(e)(5)'s invocation that HUD "administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies" of the FHA actually means as a matter of implementing HUD's policies.  The court would be called upon to weigh HUD's enforcement decisionmaking *process* which is committed to agency discretion by law for the reasons discussed in Chaney.  See also Thompson v. U.S. Dept. of Hous. & Urban Dev., 348 F.Supp. 2d  398, 417 (D. Md. 2005)(citing McGrath v. Dep't of Hous. & Urban Dev., 722 F.Supp 902, 908 (D. Mass. 1989)(stating that Section 3608 "does not mandate specific actions or remedial plans.").

The court concludes that Plaintiffs' request for a Section 702 review of HUD's decisionmaking process under Sections 3604(a) and Section 3608(e)(5) is precluded from review by Chaney and Section 701(a)(2)  and must be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).

**2.  Equal Protection Claim**

The court next considers whether Plaintiffs may obtain review of HUD's enforcement decisions as violative of the Fifth Amendment to the U.S. Constitution.  The Equal Protection Clause of the Fourteenth Amendment commands, "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.  The Fifth Amendment incorporates the same protection as the Equal Protection Clause of the Fourteenth Amendment.  See Weinberger v. Salfi, 422 U.S. 749, 768-70 (1975).

In order to establish an equal protection claim, Plaintiffs must allege that HUD created two or more classifications of similarly situated persons who were treated differently and that the classification had no relation to a legitimate governmental objective.  See Stefanoff v. Hays Cty, Tex., 154 F.3d 523, 526 (5th Cir. 1998)(citing Rolf v. City of San Antonio, 77 F.3d 823, 828 (5th Cir. 1996).

The Supreme Court has counseled, "Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."  See Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 265 (1977).  In order to adequately allege an equal protection claim, a party must set forth allegations from which the court can reasonably infer "the existence of purposeful discrimination."  See  McCleskey v. Kemp, 481 U.S. 279, 292 (1987).

Thus, in order to state a claim that they were denied housing

vouchers based on their race, Plaintiffs would have to allege that they were treated differently from non-minority residents who were similarly situated and that the official making the decision acted with a discriminatory purpose. <u>McCleskey</u>, 481 U.S. at 292 (stating that "McCleskey must prove that the decisionmakers in *his* case acted with a discriminatory purpose")(emphasis in original).

Plaintiffs fail to allege the existence of a PBRA property in a comparably deplorable condition where White non-Hispanic residents were issued housing vouchers. In the absence of a comparator property or comparator residents who were treated more favorably, Plaintiffs have failed to state an equal protection claim based on the non-issuance of housing vouchers.

### IV.  Conclusion

It is therefore **RECOMMENDED** that Defendant's Motion to Dismiss (Doc. 34) be **GRANTED** for the reasons discussed above. If this Recommendation is adopted, Plaintiffs' Amended Complaint should be dismissed in its entirety.

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically.    Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this <u>21st</u> day of February, 2020.

Nancy K. Johnson
United States Magistrate Judge